IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
---------------------------------------------------x
                                       :
KEVIN J. McNAMARA                      :        3: 06 CV 93 (PCD)
                                       :
v.                                     :
                                       :
                                       :
THERESA LANTZ et al.                   :
                                       :        DATE: AUGUST 5, 2008
---------------------------------------------------x
```

RECOMMENDED RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On January 18, 2006, plaintiff commenced this action pro se (Dkt. #1), followed by an Amended Complaint on August 14, 2006 (Dkt. #6). On March 27, 2007, counsel appeared for plaintiff (Dkt. #23), and on August 30, 2007, plaintiff filed his second Amended Complaint against defendants Commissioner of Correction Theresa C. Lantz, Correctional Health Services Program Director Patricia A. Ottolini, Program and Treatment Director Mary Johnson, Dr. Edward Blanchette, Dr. McKenna, and Hartford Correctional Center triage nurse Jane Doe. (Dkt. #30).[1] In his Second Amended Complaint, plaintiff asserts the following claims: violation of 42 U.S.C. § 1983 (Count One), and violation of Art. I §§ 8 and 9 of the Connecticut constitution, as well as intentional and negligent infliction of emotional distress (Count Two), arising out of the alleged denial of methadone treatment while plaintiff was detained for one week, from October 17 to October 24, 2005, while waiting to post bail. (Id.). The file was referred to this Magistrate Judge on May 4, 2006.

On January 31, 2008, Senior United States District Judge Peter C. Dorsey filed a Ruling and Order (Dkt. #42), which granted in part and denied in part defendants' Motion

---

[1] On January 31, 2008, Senior United States District Judge Peter C. Dorsey dismissed all claims against defendants McKenna and Doe in the absence of effective service. (Dkt. #41; see Dkt. #29).

to Dismiss. In this ruling, all federal and state claims against defendants Lantz and Johnson were dismissed for lack of personal involvement in plaintiff's medical care (<u>Id.</u> at 4-6), and plaintiff's claims under the Connecticut constitution and common law similarly were dismissed (<u>Id.</u> at 7-8). However, defendants' Motion to Dismiss was denied without prejudice as to defendants' claim that plaintiff failed to exhaust his administrative remedies, in that the "current record contains no evidence regarding the availability of administrative remedies" when a prisoner posts bail and is released. (<u>Id.</u> at 6-7).

On May 9, 2008, the remaining defendants, Ottolini and Blanchette filed the pending Motion for Summary Judgment (Dkt. #47-1), brief in support (Dkt. #47-2),[2] and Local Rule 56(a)1 Statement (Dkt. #47-3).[3] On July 22, 2008, plaintiff filed his brief in opposition (Dkts. ##55-1 & 55-2) and Local Rule 56(a)2 Statement (Dkt. #55-3). The next day, defendants filed their reply brief. (Dkt. #56).[4]

For the reasons stated below, defendants' Motion for Summary Judgment (Dkt. #47) is **granted**.

## I. DISCUSSION

The standard for summary judgment is well established. The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Upon motion, following adequate time for discovery, Rule 56(c) requires that summary judgment be

---

[2]A copy of a lengthy court decision was attached as Exh. A.

[3]Attached are the following exhibits: copy of excerpts of plaintiff's deposition, taken on March 7, 2008 ["Plaintiff's Depo."](Dkt. #47-4), and affidavit of defendant Dr. Blanchette, sworn to May 7, 2008 ["Blanchette Aff't"](Dkt. #47-5).

[4]A copy of a lengthy court decision is attached.

entered against a party

> who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." FED. R. CIV. P. 56(c).  "On summary judgment the inferences to be drawn from the underlying facts contained in the moving party's materials must be viewed in the light most favorable to the party opposing the motion." Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)(citation, internal quotations & alteration omitted).  "If reasonable minds could differ as to the import of the evidence, . . . the moving party simply cannot obtain summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)(citations & internal quotation marks omitted).  Thus, the party moving for summary judgment must "carry its burden of showing the absence of any genuine issue of fact." Adickes, 398 U.S. at 153.

A. FACTUAL BACKGROUND

The following factual summary is drawn from defendants' Local Rule 56(a)1 Statement of Facts, filed May 9, 2008 (Dkt. #47-3)["Defendants' Statement"], the accompanying affidavit and excerpts of deposition testimony, and from plaintiff's Local Rule

56(a)2 Statement of Facts, filed July 22, 2008 (Dkt. #55-3)["Plaintiff's Statement"].[5]  Such

_____

[5]Of the forty-two paragraphs in Defendants' Statement, plaintiff admitted twelve of them (¶¶ 1, 10-11, 15, 25, 27-29, 31, 38, 40 & 42), denied twenty-one of them (¶¶ 2, 4-5, 8, 12-14, 16-24, 26, 30, 36, 39 & 41), and lacked sufficient information to admit or deny the remaining nine of them (¶¶ 3, 6-7, 9, 32-35 & 37).

As defendants appropriately point out in their reply brief (Dkt. #56, at 2), Local Rule 56(a)3 specifically provides:

> Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. The affidavits, deposition testimony, responses to discovery requests, or other documents containing such evidence shall be filed and served with the Local Rule 56(a)1 and 2 Statements in conformity with Fed. R. Civ. P. 56(e). The "specific citation" obligation of this Local Rule requires counsel . . . to cite to specific paragraphs when citing affidavits or responses to discovery requests and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length. Counsel . . . are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)1 or in the Court imposing sanctions, including, when the movant fails to comply, an order denying the motion for summary judgment, and, when the opponent fails to comply, an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law. (emphasis added).

Plaintiff has not cited to any evidence to support his denial of the twenty-one paragraphs listed above.   Under identical circumstances, last year, Judge Dorsey held that when a plaintiff "fail[ed] to meet the requirements" of Local Rule 56(a)(3) in that her denials of eight paragraphs in defendants' Local Rule 56(a)1 Statement "[did] not provide a specific citation to the record," then the eight paragraphs would be "deemed admitted."  Lachira v. Sutton, No. 3:05 CV 1585 (PCD), 2007 WL 1346913, at *5 (D. Conn. May 7, 2007)(multiple citations & footnotes omitted).  See also Conge v. Sikorsky Aircraft Corp., No. 3:05 CV 1650 (PCD), 2007 WL 4365676, at *1, n.1 (D. Conn. Dec. 11, 2007). These twenty-one paragraphs are deemed admitted.

Defendants further argue that with respect to nine of the paragraphs, because plaintiff did not specifically deny them, the paragraphs should be deemed admitted.  (Dkt. #56, at 1).  While defendants are correct that Local Rule 56(a)2 does not reference a response that neither admits or denies a statement, there obviously can be situations when a party in good faith, based upon the evidence to date, can neither admit nor deny a statement.  Cf. FED. R. CIV. P. 36(a)(4)("The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.").  These nine paragraphs all regard medical opinions held by defendant Dr. Blanchette, and in the absence of any medical evidence to the contrary, similarly will be deemed admitted.

factual summary, therefore, does not represent factual findings of the Court.

Thousands of inmates with drug habits are admitted annually to Connecticut prison facilities for stays of various lengths; the withdrawal from the opiate methadone is much less severe than the withdrawal from the opiate heroin. (Defendants' Statement ¶ 5; Blanchette Aff't ¶ 7). (Id.). Neither the Connecticut Department of Correction nor UCONN Correctional Managed Health Care ["UCMHC"] use methadone in its male correctional facilities as part of its drug detoxification program and neither entity has any plans to do so in the future. (Defendants' Statement ¶ 1; Blanchette Aff't ¶ 5; Plaintiff's Statement ¶ 1). Very few prisons used methadone with male offenders in 2005. (Defendants' Statement ¶ 2; Blanchette Aff't ¶¶ 5, 39). Rather, for many years, prior to 2006, the DOC implemented a drug detoxification program in its male facilities which calls for the administration of the anti-anxiety medication Vistaril to relieve the anxiety and tension associated with opiate withdrawal, and Clonodine, a medication used to lower blood pressure which also is used in alcohol and opiate withdrawal. (Defendants' Statement ¶ 3; Blanchette Aff't ¶ 6). The DOC and/or UCMHC also treated any other symptoms that appeared during the course of drug withdrawal, such as pain and diarrhea, by alleviating the symptoms of withdrawal rather than satisfying an inmate's craving for opiates. (Defendants' Statement ¶ 4; Blanchette Aff't ¶¶ 6, 38). The cravings generally subside over a period of one or two weeks. (Defendants' Statement ¶ 4; Blanchette Aff't ¶ 6).

The DOC and UCMHC have had excellent results treating the symptoms of drug withdrawal and see absolutely no medical necessity for the use of methadone as part of their detoxification program in their male facilities. (Defendants' Statement ¶ 5; Blanchette Aff't ¶ 7). Since 2006, the DOC and UCMHC have added Buprenorphine, which is often used in

the management of opioid dependence, as a medication regimen for inmates who are unequivocally withdrawing from opiates. (Defendants' Statement ¶ 6; Blanchette Aff't ¶ 8).

### 1. PLAINTIFF'S DETENTION FROM OCTOBER 17, 2005 TO OCTOBER 24, 2005

While Dr. Blanchette was not directly involved in the care or treatment of plaintiff from October 17, 2005 to October 24, 2005, he has reviewed plaintiff's medical file in detail for the period of time at issue in this case. (Defendants' Statement ¶ 7; Blanchette Aff't ¶ 9). On October 16, 2005, plaintiff in this case was arrested for selling illegal drugs and, the next day, he was admitted to Hartford Correctional Center ["HCC"]. (Defendants' Statement ¶ 8; Blanchette Aff't ¶ 10). There, a nurse saw him and learned from plaintiff that he had been apparently taking methadone and obtained a telephone order for Vistaril,[6] 50 mg by mouth, three times a day for five days. (Defendants' Statement ¶ 8; Blanchette Aff't ¶ 10). The next morning, on October 18, 2005, plaintiff was seen by a physician who noted that plaintiff reported he was on Atenol for high blood pressure but had not received the medication that morning. (Defendants' Statement ¶ 10; Blanchette Aff't ¶ 12; Plaintiff's Statement ¶ 10). The doctor noted that plaintiff's blood pressure was within normal limits but that it would be checked every day, and if it was noted to be high, it would be treated. (Id.). Later that afternoon, plaintiff was assessed to determine if he could be sent to Northern Correctional Institution. (Defendants' Statement ¶ 11; Blanchette Aff't ¶ 13; Plaintiff's Statement ¶ 11). The psychologist sent plaintiff to Garner Correctional Institution ["Garner"] for a further mental health evaluation. (Id.).

---

[6]Vistaril is a medication that depresses activity in the central nervous system (brain and spinal cord), which causes relaxation and relief from anxiety. (Defendants' Statement ¶ 9; Blanchette Aff't ¶ 11). Vistaril is used to treat anxiety disorders and tension in stressful situations, and it may also increase the effects of other medicines, such as pain relievers. (Id.).

On October 18, 2005, plaintiff was seen at Garner in the Inpatient Mental Health Unit ["IMHU"] and stated that he felt alright, was just a little anxious, but wanted to sleep and was not suicidal.  (Defendants' Statement ¶ 12; Blanchette Aff't ¶ 14).  It was noted that plaintiff took his bedtime medications.  (Id.).  Plaintiff was observed two hours later to be resting with no signs of distress.  (Defendants' Statement ¶ 13; Blanchette Aff't ¶ 15).

On October 19, 2005, plaintiff was observed at 12:30 a.m. as resting quietly, at 2:30 a.m. as sleeping, at 4:30 a.m. as resting quietly, and at 6:30 a.m. as eating the meal served with no complaints voiced.  (Defendants' Statement ¶ 14; Blanchette Aff't ¶ 16).  It was noted that plaintiff took no morning medications.  (Id.).  At 10:00 a.m. on October 19, 2005, plaintiff was sleeping, and at noon, it was noted that he told a nurse and doctor that he did not want medications yet.  (Defendants' Statement ¶ 15; Blanchette Aff't ¶ 17; Plaintiff's Statement ¶ 15).  It was further noted that there were no hand tremors and that plaintiff walked with a steady gait.  (Id.).  At 1:45 p.m., plaintiff saw the psychiatrist who noted that plaintiff had bipolar disorder and was previously treated with Risperdal; plaintiff indicated that he was agreeable to taking Risperdal.  (Defendants' Statement ¶ 16; Blanchette Aff't ¶ 18).  Later in the day, plaintiff saw Dr. O'Halleran, a physician, and reported that he had nausea and vomiting and was unable to sleep some at night.  (Defendants' Statement ¶ 17; Blanchette Aff't ¶ 19).  Dr. O'Halleran noted that, according to plaintiff, he was taking methadone and his last dose was Monday at which time he claimed to have taken 60 mg. (Id.).  Plaintiff denied heavy alcohol consumption in the past although his chart indicated plaintiff had alcohol dependency in the past.  (Id.).  Plaintiff's blood pressure was 112/67 and his pulse was 63.  (Id.).  Dr. O'Halleran continued the Vistaril order but also ordered Catapres or Clonodine if plaintiff's blood pressure went up or if plaintiff had agitation which was not

controlled by the Vistaril. (Id.). On that day, it was noted that plaintiff went out for recreation and ate lunch and had no issues. (Defendants' Statement ¶ 18; Blanchette Aff't ¶ 20). He was observed by medical staff three more times on October 19, 2005, to be without issues. (Defendants' Statement ¶ 19; Blanchette Aff't ¶ 21).

On October 20, 2005, Dr. Cartwright, the psychiatrist, APRN Fritz and Dr. Nowinski, the psychologist, all agreed that plaintiff's mental health treatment needs score could be decreased from 5 to 4. (Defendants' Statement ¶ 20; Blanchette Aff't ¶ 22). Plaintiff was awake for his meal at 10:00 a.m. and again at 4:30 p.m.; no complaints or problems were noted. (Id.).

On October 21, 2005, plaintiff complained of some GI upset and was encouraged to utilize his order for Clonodine. (Defendants' Statement ¶ 21; Blanchette Aff't ¶ 23). Staff checked plaintiff at 1:30 p.m., 3:40 p.m., and 5:10 p.m., and it was noted that plaintiff presented no physical complaint, though at 5:10 p.m., plaintiff did state that he was concerned as his wife was supposed to bond him out. (Id.).

Plaintiff was checked at 12:00 a.m. on October 22, 2005, and again at 11:30 a.m.; plaintiff had no physical complaints and he ate his lunch. (Defendants' Statement ¶ 22; Blanchette Aff't ¶ 24). Later in the day, at 2:45 p.m., plaintiff refused his Vistaril stating, "I ain't taking none of those pills[.] If I'm still here tonight[,] I'll take them." (Defendants' Statement ¶ 23; Blanchette Aff't ¶ 25). At 6:00 p.m., it was noted that plaintiff stated he made a mistake, he was not bonding out that night and that he would take his medications. (Defendants' Statement ¶ 24; Blanchette Aff't ¶ 26). Plaintiff stated that his bones hurt, he could not sleep, and that he had racing thoughts but that the medications helped. (Id.). Plaintiff was observed at 10:00 p.m. sleeping, in no distress. (Defendants' Statement ¶ 25;

Blanchette Aff't ¶ 27; Plaintiff's Statement ¶ 25).

At 1:00 a.m. on October 23, 2005, plaintiff was observed in no distress; at 10:30 a.m. he was calm and quiet. (Id.). Four hours later, at 2:30 p.m., plaintiff had no signs of withdrawal, no tremors, and he spoke clearly and calmly. (Defendants' Statement ¶ 26; Blanchette Aff't ¶ 28). At 6:00 p.m. on October 23, 2005, it was noted that plaintiff ate his meal and offered no complaints. (Defendants' Statement ¶ 27; Blanchette Aff't ¶ 29; Plaintiff's Statement ¶ 27). Later that evening, plaintiff told the CSW that sometimes he can get manic, real high, like he can do anything, and then get real low. (Defendants' Statement ¶ 28; Blanchette Aff't ¶ 30; Plaintiff's Statement ¶ 28). Plaintiff was engaged in this conversation and maintained good eye contact, but he presented with symptoms of mania. (Id.). Plaintiff discussed being bonded out by his wife tomorrow, that he was looking forward to seeing his family and "going to the mountains to see the foliage." (Id.). At 10:00 p.m., it was noted that while plaintiff refused his 6:00 p.m. Vistaril, he took his bedtime Vistaril with regular medication and a Motrin for general body aches. (Defendants' Statement ¶ 29; Blanchette Aff't ¶ 31; Plaintiff's Statement ¶ 29).

On October 24, 2005, at midnight, it was noted that plaintiff was resting in bed and offered no complaints. (Defendants' Statement ¶ 30; Blanchette Aff't ¶ 32). Six hours later, it was noted that plaintiff took his medications and meal without complaint. (Id.). On this same day, the psychiatrist, Dr. Cartwright, saw plaintiff and noted that plaintiff reported that he was doing well on his current medication; Dr. Cartwright ordered that plaintiff could discharge out of IPMU to HCC. (Defendants' Statement ¶ 31; Blanchette Aff't ¶ 33; Plaintiff's Statement ¶ 31).

## 2.  USE OF METHADONE TREATMENT

Methadone is still considered an experimental drug for licensing purposes, and a special license is required for each facility in which it is administered.  (Defendants' Statement ¶ 32; Blanchette Aff't ¶ 34).  The DOC has secured a license to use methadone in its York facility for women.  (Defendants' Statement ¶ 34; Blanchette Aff't ¶ 34).[7]  If a woman undergoes withdrawal while pregnant, the fetus will suffer withdrawal under conditions that cannot be closely monitored.  (Defendants' Statement ¶ 33; Blanchette Aff't ¶ 35).  Withdrawal during the first trimester of pregnancy poses significant dangers to fetal development and increases significantly the likelihood of fetal abnormalities.  (Id.).  Withdrawal during the third trimester of pregnancy creates a risk that the fetus will abort or that a live birth will be substantially premature.  (Id.).  Women are generally given the option of being gradually detoxed during the second trimester or maintaining a low dose of methadone until they give birth.  (Defendants' Statement ¶ 34; Blanchette Aff't ¶ 35).  Women may not always agree to a pregnancy test upon admission to York.  (Defendants' Statement ¶ 35; Blanchette Aff't ¶ 36).  Since the pregnancy status of women is often unknown upon admission and since methadone is available at the facility under special license, opiate-addicted women may be offered a methadone detoxification program.  (Id.).  If it is subsequently learned that a woman is pregnant, the detoxification program can be changed to a low dose maintenance program until such time as withdrawal can safely occur without harm to the fetus.  (Id.).

There are legitimate medical reasons for offering a methadone maintenance and/or

_____

[7]Number 34 precedes number 33 in Defendants' Statement.  To be consistent, the citation here corresponds to the numbering in Defendants' Statement.

detoxification program at the women's prison facility. (Defendants' Statement ¶ 36; Blanchette Aff't ¶ 37). In the case of the men's facilities, it is simply not medically necessary, and it would be unwise from both a medical and a security standpoint, to introduce a highly addictive controlled substance into the men's facilities where it may be subject to abuse and misuse with little or no medical benefit. (<u>Id.</u>). The medications that are given in the men's facilities to treat the symptoms of drug withdrawal are prescribed by the medical staff who are very familiar with the signs and symptoms of drug withdrawal. (Defendants' Statement ¶ 37; Blanchette Aff't ¶ 38).

### 3. <u>PLAINTIFF'S CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS</u>

_____Plaintiff's claims against Director Ottolini are that prior to his incarceration on October 17, 2005, he wrote to her to complain that male offenders were not being given methadone in prison. (Defendants' Statement ¶ 38; Plaintiff Depo. at 65-67; Plaintiff's Statement ¶ 38). Similarly, plaintiff has sued Dr. Blanchette complaining that by not providing methadone to male offenders, he knowingly caused plaintiff harm. (Defendants' Statement ¶ 39; Plaintiff Depo. at 67-68). According to plaintiff, he has never been advised by a physician that it is medically inappropriate to provide Vistaril for withdrawal from methadone for a person in custody. (Defendants' Statement ¶ 40; Plaintiff Depo. at 69; Plaintiff's Statement ¶ 40). Plaintiff's discrimination complaint is based upon the fact that women receive methadone and men do not. (Defendants' Statement ¶ 41; Plaintiff Depo. at 71). Regarding his claim for emotional distress, plaintiff testified that he tries not to remember anything that caused him grief. (Defendants' Statement ¶ 42; Plaintiff's Depo. at 27, 30; Plaintiff's Statement ¶ 42).

B. DEFENDANTS' MOTION

Defendants assert that plaintiff cannot prove that the policy for treating inmates admitted to custody who were on methadone violated his due process rights, as the decision not to provide methadone to offenders is not itself unconstitutional (Dkt. #47, Brief, at 10-11); plaintiff cannot establish that defendants were deliberately indifferent in failing to develop a policy under which male offenders would be provided with methadone (id. at 11-18); and plaintiff cannot establish that providing methadone to female but not male offenders violates the Equal Protection Clause of the Fourteenth Amendment (id. at 18-20). Additionally, defendants contend that they are entitled to qualified immunity as reasonable correctional health care administrators could disagree over whether they were violating a male inmate's rights by not providing methadone. (Id. at 20-21).

### 1. DUE PROCESS, 42 U.S.C. § 1983 CLAIM

In order to prevail on this claim, plaintiff must demonstrate that the decision of defendants Dr. Blanchette and Ottolini not to provide him with methadone was unconstitutional; to establish an unconstitutional denial of medical care under the Eighth Amendment, a prisoner must prove "deliberate indifference" to an inmate's "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104 (1976)(citation omitted), reh. denied, 429 U.S. 1066 (1977); Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)(citation omitted), cert. denied sub. nom. Foote v. Hathaway, 513 U.S. 1154 (1995). As the U.S. Supreme Court has cautioned: "Courts are ill equipped to deal with the increasingly urgent problems of prison administration, . . . [and it is] not wise for [a judge] to second-guess the expert administrators on matters on which they are better informed." Bell v. Wolfish, 441 U.S. 520,

531 (1979)(citation omitted).

Where there has been no "formal adjudication of guilt in accordance with due process of law," "the relevant constitutional provision is not the Eighth Amendment but is, instead, the Due Process Clause of the Fourteenth Amendment." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)(citations & internal quotation omitted). In this case, because plaintiff was a pretrial detainee at HCC and Garner at the time, the Eighth Amendment did not apply to plaintiff's incarceration. See id. However, the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner, and a physician's "deliberate indifference" to a pretrial detainee's "serious medical needs" would be proscribed by the Due Process Clause of the Fourteenth Amendment. Id. (citation omitted); see also Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996)(citations omitted); Marczeski v. Handy, No. 3:01 CV 1437 (AHN)(HBF), 2004 WL 2476440, at *8-9 (D. Conn. Sept. 9, 2004)(multiple citations omitted).

Establishing deliberate indifference to an inmate's serious medical needs on the part of prison officials requires a showing of "more than negligence, but less than conduct undertaken for the very purpose of causing harm." Hathaway, 37 F.3d at 66. The Due Process Clause of the Fourteenth Amendment is "not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." Daniels v. Williams, 474 U.S. 327, 328 (1986)(emphasis in original). "Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law." Id. at 332. See also Davidson v. Cannon, 474 U.S. 344, 348 (1986)(holding that the

protections of the Due Process Clause, whether procedural or substantive, are not triggered by lack of due care by prison officials). Moreover, "[a] difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983." United States ex rel. Hyde v. McGinnis, 429 F.2d 864, 867-68 (2d Cir. 1970)["Hyde"](citation omitted). In Hathaway, the Second Circuit concluded that the prison doctor who "personally saw and treated [the inmate] on the majority of the numerous occasions on which [the inmate] complained about pain" acted with deliberate indifference to the inmate's pain as he "knew the extent of [the inmate's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the inmate's] situation." Id. at 68.

There are both subjective and objective components to the deliberate indifference standard. Id. at 66. The alleged deprivation must be "sufficiently serious" in objective terms. Wilson v. Seiter, 501 U.S. 294, 298 (1991). See also Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990)(Pratt, J., dissenting)("'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain"). The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)(citation omitted). In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious. See Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." Hathaway, 37 F.3d at 66. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

The precise issue raised here has been addressed in numerous federal court decisions, spanning more than three decades, with varying results that rely upon the specific facts of each case.[8]  The earliest of these cases was Cudnik v. Kreiger, 392 F. Supp. 305 (N.D. Ohio 1974), where the plaintiff, who was unable to post bail and who was receiving methadone from a drug treatment program, was denied methadone pursuant to the policy set by the county sheriff; instead, the prison doctor dispensed librium, chloral hydrate, Darvon, phenobarbital and belladona, which "is a medically accepted course of treatment for withdrawal symptoms." Id. at 307-08.[9]  Treatment could take as long as ten days, and in plaintiff's case, she "suffered severe and debilitating symptoms of withdrawal" for two days. Id. at 308.  Not surprisingly, plaintiffs' two medical expert witnesses disagreed with the opinions expressed by the prison doctor at trial.  Id.  The district judge rejected all of

---

[8]Plaintiff's short brief mentions two of these cases (Dkt. #55, at 4); defendants' brief cites three of them in their discussion of qualified immunity. (Dkt. #47, at 21).  See also Boucher, The Case of Methadone Maintenance Treatment in Prisons, 27 VT. L. REV. 453, 465-82 (2003)(discussing many of these cases).

[9]The cases cited below are inconsistent as whether the names of the prescription drugs are capitalized or not. This ruling will refer to the medications as they appear in the rulings discussed herein.

defendants' arguments in favor of substituting the "withdrawal kit" for methadone: (1) defendants' method leaves a detainee "incapacitated" for as long as ten days, so that he or she may be unable to communicate with counsel effectively during that time period; and (2) jail security could be enhanced by segregating the detainees receiving methadone, so as not to create "an illicit jail market for methadone and the possibility of theft of the drug."[10] The district judge thus held:

> The jail policy of denying methadone to pretrial detainees, who were receiving treatment at a methadone program prior to incarceration, is in essence a state sanctioned measure of involuntary rehabilitation. . . . The policy does not effectuate the state's narrow interests in pretrial confinement and causes a deprivation that is not suffered by bailed methadone addicts. The policy thus constitutes punishment imposed without a finding of criminal culpability and, as such, is violative of fundamental due process rights.

Id. at 312-13.

The first appellate decision on this issue was Norris v. Frame, 585 F.2d 1183 (3d Cir. 1978), regarding a plaintiff who was unable to make bail and who had been receiving methadone for seven months from a methadone clinic; the day after his arrest, he was examined by a prison doctor, who treated him with the tranquilizer thorazine, in that "[m]ethadone was not regularly dispensed at the prison." Id. at 1185. Four days later, plaintiff was examined again, and the doctor did not find him to be exhibiting the usual symptoms associated with drug withdrawal. However, four days after that, plaintiff slashed his left wrist, for which he was hospitalized; when he was released from the hospital to the prison (where he remained for several months), he was given librium, valium, and benadryl, but never methadone. Id. at 1185-86. After a bench trial, the district judge held that plaintiff did not prove a § 1983 violation, but "at most, medical malpractice." Id. at 1186.

---

[10]The court characterized these problems as "at best highly remote." Id.

The Third Circuit reversed and remanded, however, in order to develop a more complete record on whether defendants articulated a security interest that was more significant than plaintiff's liberty interests. Id. at 1189 (footnote omitted). As the Third Circuit conceded:

> There is no constitutional right to methadone and the County is under no duty to provide it. Methadone is a carefully controlled substance and may be dispensed to qualifying recipients only by approved facilities. Although Pennsylvania law requires that addicts receive "medical detoxification" if incarcerated, it does not require the establishment of methadone maintenance facilities at correctional institutions. No prisoner, pretrial detainee or citizen can compel the state to provide him with the drug.

Id. at 1188 (multiple citations omitted). The Third Circuit remanded, however, so that the trial judge could decide the "initial question" of "whether [defendants'] refusal to allow [plaintiff] access to a prescribed course of treatment constitutes a restriction that is inherent in confinement and the needs of orderly prison administration or whether it is an additional restriction, unrelated to guaranteeing [plainitff's] presence at his trial or security at the institution." Id. at 1189.

The following year, the Third Circuit reversed the dismissal of a complaint brought by a pretrial detainee, held for more than six weeks, who, despite consuming eight bags of heroin a day, was afforded no medical care for the first ten days of his incarceration (in violation of a state statute) and "inadequate medical treatment" for the period thereafter; during the first ten days, he suffered from "severe withdrawal symptoms," including stomach cramps, chills, sweating, lack of sleep, and "dry heaves." U.S. ex rel. Walker v. Fayette County, 599 F.2d 573, 574 (3d Cir. 1979)(per curiam)["Walker"]. The Third Circuit distinguished between cases where a prisoner alleges "a complete denial of medical care and those alleging inadequate medical treatment"; for the latter, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts

17

are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." Id. at 575, n.2 (citations omitted)(emphasis added). Because plaintiff was denied medical attention for ten days, in violation of a Pennsylvania statute requiring a medical examination within two days of admission to a correctional institution, the Third Circuit held that "under the specific circumstances of this case," defendants' actions "constituted a 'deliberate indifference to serious medical needs of prisoners.'" Id. at 576 (citation omitted).

Fourteen years ago, a similar conclusion was reached regarding a pretrial detainee, who was a participant in a methadone maintenance treatment program, but who had to wait three days until the medical staff at Rikers Island received confirmation from this program that plaintiff indeed was a participant, after which plaintiff was prescribed methadone for twenty-one days in jail. Messina v. Mazzeo, 854 F. Supp. 116, 122 (E.D.N.Y. 1994). In support of their motion to dismiss, defendants submitted a prison doctor's affidavit that plaintiff did not suffer from any of the acute symptoms of withdrawal, whereas plaintiff alleged that during this three-day period, he did experience "serious withdrawal symptoms," including vomiting, chest pains, and near fainting, and that one of the prison doctors had responded to him: "I don't care what you do. You can stand on your head, tear the place apart, you're not getting methadone." Id. at 122-23, 140. These allegations, the court found, alleged facts that, if proved, would demonstrate a violation of plaintiff's Fourteenth Amendment rights, precluding dismissal of the action. Id. at 140 (citation omitted).

Similarly, summary judgment was denied in Anderson v. Benton County, Nos. 03-6155-TC, 03-806-TC, 2004 WL 2110690 (D. Or. Sept. 21, 2004), where the plaintiff was serving a ten-day incarceration for DUI; he had been prescribed oxycodone, methadone, and

gabapentin as painkillers for "extreme back and knee pain."  Id. at *1.  Upon his arrival at the county jail, a prison physician, who did not examine plaintiff, prescribed only oxycodone and gabapentin, but not methadone.   After two days, plaintiff started to go through withdrawal, and was started on Keopectate for diarrhea.  Id. at *1.  For the next two days, his requests for methadone were denied; he eventually was placed in the hospital after he reinjured his back, unrelated to his drug withdrawal.  Id. at *2.   Defendants provided testimony from jail staff that plaintiff did not have any symptoms of withdrawal while he was in jail; plaintiff submitted two expert medical opinions regarding the "severe withdrawal symptoms" that arise from cessation of methadone, even with the administration of oxycodone, as well as his testimony of twitching and feeling like he was dying.  Id. at *4-6.  The magistrate judge thus found that summary judgment was inappropriate in that "a reasonable factfinder could find that the doctors or the jail staffs were deliberately indifferent to [plaintiff's] serious medical needs."  Id. at *6 (footnote omitted).

The Seventh Circuit reversed the granting of summary judgment in defendants' favor in Foelker v. Outagamie County, 394 F.3d 510 (7th Cir. 2005), in which the plaintiff had been on a methadone maintenance treatment program for five weeks when he turned himself in to prison; upon his arrival, he informed a nurse that he needed methadone to avoid going into withdrawal.   Id. at 511-12. The next day, he was examined by the jail's nursing coordinator, who was advised by the methadone program that plaintiff should receive a reduced dose of methadone while in prison.  Id. at 512.  On the third day, plaintiff began to defecate on himself, and became confused, disoriented and was hearing voices.  Id.  When these symptoms progressed, on the fourth day, a jail doctor prescribed thiamine; when the medication did not alleviate plaintiff's symptoms, he was sent to the hospital where he

remained for four days, having been diagnosed with "acute delirium, secondary to drug withdrawal." Id. Under these circumstances, the Seventh Circuit held that a reasonable jury could find that at least one of the defendants "recklessly or maliciously allowed the situation to fester," so that plaintiff's case "should not have been short-circuited on summary judgment." Id. at 513-14.

Two summers ago, the same conclusion was reached in Davis v. Carter, 452 F.3d 686 (7th Cir. 2006), when the plaintiff's husband, who had a long history of drug and alcohol addiction and who was on a methadone maintenance program, reported to Cook County Jail to serve a ten-day sentence for a traffic violation; his repeated requests for methadone were denied, and he died in prison six days later from a cerebral aneurysm, unrelated to this issue. Id. at 688. The normal procedures and sequence of events (wherein a correctional medical technician notifies the prison pharmacy, which in turn contacts the methadone program to verify the inmate's information), was not followed here, because plaintiff's husband arrived at the jail on a Friday, the prison pharmacy did not receive the information until late Friday night, and due to limited pharmacy staffing over the weekend, the verification was not received by the pharmacy until Monday. Id. at 689. Plaintiff's husband still did not receive his methadone on Monday or Tuesday, by which time he was "dope sick" and in need of medical care. Id. The prison paramedics, who were unaware of the pharmacy's efforts, attempted to receive verification of plaintiff's participation in a methadone program, but were told it would take three days to obtain such verification. Id. at 689-90. On Wednesday, plaintiff was administered Compazine and Loperamide, which "help[] to alleviate some of a patient's methadone withdrawal symptoms, but do[] not address all of them, nor [are they] a substitute for methadone treatment." Id. at 691. He suffered a cerebral aneurysm later

that day, and died shortly thereafter.  Id.  A prison pharmacist testified at his deposition that while it can "routinely" take one or two days for the pharmacy to confirm an inmate's participation in a methadone program, "there is essentially no established checks-and-balances system to make sure that patients who suffer from methadone withdrawal . . . do not fall through the cracks for several days (or more)."  Id. at 692.  The Seventh Circuit held that plaintiff had "presented enough evidence from which a reasonable jury could conclude that Cook County had a wide-spread custom or practice of failing to provide timely methadone treatment and that [the] individual defendants . . . were deliberately indifferent to [plaintiff's husband's] medical needs."  Id. at 687 (footnote omitted).

On the other hand, there are several cases which have held the opposite way, obviously on less compelling facts.  For example, in Holly v. Rapone, 476 F. Supp. 226 (E.D. Pa. 1979), the plaintiff, who was a heroin addict and unable to post bond, was advised by the prison's intake officer that methadone was not available at the prison, but that plaintiff would be examined by paramedics.  Id. at 229.  The next day, he began to suffer from vomiting, profuse perspiration, severe body pain, and "became disarranged mentally"; on the following day, he was taken to the prison hospital and prescribed Mylanta and Vistaril. Id. He was placed on a waiting list to see a doctor for a prescription for methadone, but within two days, had regained his appetite.  Id.  The district judge observed that unlike Walker, this plaintiff was examined by trained medical personnel within two days, as required by Pennsylvania statute, and as ruled by the Third Circuit in Norris, "neither a prisoner nor a pretrial detainee can compel county prison officials to provide him with the drug."  Id. at 230 (citations omitted).   As to the substance of plaintiff's claim, the district judge held that within two days of his admission, and within one day of exhibiting withdrawal symptoms, he was

placed on Mylanta and Vistaril.  Id. at 231.  Therefore, he concluded that "plaintiff's allegations have not approached the repugnancy of those acts prescribed by the eighth amendment," so that dismissal was warranted.  Id. (footnote omitted).

The Third Circuit upheld a district judge's findings in favor of defendants on this issue in Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir. 1979), where any inmate who was receiving methadone treatment from an authorized treatment center in the county prior to his incarceration to the county jail was permitted to receive methadone treatment for up to six days, after which time the treatment was discontinued and the inmates instead were given the tranquilizer Sparine, Tylenol, Maalox, and Benadryl.  Id. at 758, 760 & n.6.  At trial, one of plaintiffs' experts testified that an inmate would need seven days of methadone treatment, while another testified that the medication was needed for a twenty-one day period; the jail's physicians obviously disagreed.  Id. at 760.   In distinguishing its decision in Norris, the Third Circuit now held that there was nothing in the record that indicated a punitive purpose on the part of the jail authorities, and that there "also appear[ed] to be a permissible purpose in curtailing the methadone treatment" to avoid the "well-known" "potential for jail or prison disruption caused by the presence of drugs."  Id. at 761.

Summary judgment was granted for defendants two years ago in Boyett v. County of Washington, No. 2:04 CV 1173, 2006 WL 3422104 (D. Utah Nov. 28, 2006), aff'd, No. 06-4315, 2008 WL 2483286, at *6 (10th Cir. June 19, 2008), where plaintiffs' decedent had been seen by jail nurses and a physician's assistant ["PA"] within four and five days, respectively, of his arrival at jail, as he was having complications from recent surgery.  Id. at *1-2.  The PA prescribed Clonidine to treat his Methadone withdrawal.  Id. at *2.  He continued to see several more jail medical staff over the next five days, as his medical condition (Hepatitis C,

liver failure, psychotic behavior, and head injury) continued to deteriorate; he was found dead from occlusive coronary artery disease and cirrhosis of the liver one hour after he was last checked. Id. at *2-3. The PA explained that inmates can be beaten or abused by other inmates who want their methadone. Id. at *27. The district judge held:

> There is no evidence negating the appropriateness of prescribing substitute medications to mimic Methadone's effect on the body. . . . [A]t the low levels of Methadone [plaintiffs' decedent] was receiving, withdrawal was not a major concern. In this case, the court finds [plaintiffs' decedent] had no constitutional right to Methadone treatment. Other courts have reached similar conclusions. Even if the court had found Methadone treatment to constitute a constitutional right, [plaintiffs have] failed to establish Washington County personnel acted with deliberate indifference to this right[,] a necessary finding for a constitutional violation based on deficient medical care. Instead, [the PA] took special care to address [plaintiffs' decedent's] Methadone treatment issues.

Id. (footnote omitted).[11]

As previously indicated, on October 16, 2005, plaintiff was arrested for selling illegal drugs and the next day, he was admitted to HCC, where plaintiff advised a nurse that he had been apparently taking methadone, and the nurse thereafter obtained a telephone order for Vistaril, 50 mg by mouth, three times a day for five days. (Defendants' Statement ¶ 8;

---

[11]See also Mellender v. Larson, No. 06 C-547-C, 2006 WL 3523099, at *2-3 (W.D. Wis. Dec. 6, 2006)(prison physician's reduction of plaintiff's dose of methadone, which resulted in "some discomfort" to plaintiff, was unlikely to succeed on the merits, precluding a preliminary injunction); Upthegrove v. Kuka, 408 F. Supp. 2d 708 (W.D. Wis. 2006)(summary judgment granted for defendants when plaintiff's failure to receive increased dosage of methadone for his severe back pain was due to plaintiff's failure to stay in line for medications); Mower v. Dauphin County Prison, No. 1 CV 05-909, 2005 WL 1322738, at *5 (M.D. Pa. June 1, 2005)(plaintiff-inmate failed to allege a constitutional violation with respect to prison's lack of methadone program, particularly when plaintiff did not assert that he suffered any weight loss, sickness, or malnutrition as a result of his diarrhea), Magistrate Judge's ruling approved absent objection, Mower v. Dauphin County Prison, No. 1 CV 05-909, 2005 WL 1528397(M.D. Pa. June 28, 2005)(inmates have no constitutional right to methadone programs)(citations omitted); Montalvo v. Jennings, No. 93 CIV. 8351 (KMW), 1996 WL 148483, at *1, 4 (S.D.N.Y. Apr. 1, 1996)(summary judgment granted for defendants when plaintiff was held for only two days in pretrial detention, had his methadone taken from him during arrest, had some withdrawal symptoms while appearing in court, and went directly to his methadone clinic immediately upon his release).

Blanchette Aff't ¶ 10). This prescription is consistent with the long-standing policy of the DOC, and other prison systems, not to use methadone, but instead to prescribe Vistaril and/or buprenorphine, and if needed, Clonodine, and if any other symptoms arise (such as pain or diarrhea), treating those symptoms instead of craving for opiates; this process generally works within a one to two-week period, and the DOC and UCMHC have had success with this method. (Defendants' Statement ¶¶ 2-6; Blanchette Aff't ¶¶ 5-8). Methadone is still considered an experimental drug for licensing purposes, and a special license is required for each facility in which it is administered; the only DOC facility with a license to use methadone is the York facility for women. (Defendants' Statement ¶¶ 32, 34; Blanchette Aff't ¶ 34).

The next afternoon, on October 17, 2005, a psychologist sent plaintiff to Garner for a further mental health evaluation. (Defendants' Statement ¶ 11; Blanchette Aff't ¶ 13; Plaintiff's Statement ¶ 11). Plaintiff was thereafter monitored at the Garner IMHU from October 18 through 25, 2005, at times refused his medication but at other times took it, and showed no signs of distress. (Defendants' Statement ¶¶ 12-30; Blanchette Aff't ¶¶ 14-32). On October 19, 2005, during a consultation with Dr. Cartwright, a psychiatrist, plaintiff indicated that he was agreeable to taking Risperdal, which he previously had taken for his bipolar disorder. (Defendants' Statement ¶ 16; Blanchette Aff't ¶ 18). Later that day, another physician, Dr. O'Halleran, also ordered Catapres or Clonodine if plaintiff's blood pressure went up or if plaintiff had agitation which was not controlled by the Vistaril. (Defendants' Statement ¶ 17; Blanchette Aff't ¶ 19). On October 21, 2005, plaintiff complained of some GI upset and was encouraged to utilize his order for Clonodine. (Defendants' Statement ¶ 21; Blanchette Aff't ¶ 23). On October 25, 2005, Dr. Cartwright

ordered that plaintiff could discharge out of IPMU back to HCC. (Defendants' Statement ¶ 31; Blanchette Aff't ¶ 33; Plaintiff's Statement ¶ 31).

In his brief in opposition, plaintiff argues that defendants "knew of, and disregarded, . . . [p]laintiff's serious medical needs[,] causing [him] substantial and chronic pain and discomfort, and thereby constitutional injury." (Dkt. #55, at 2). Referring to the Pfizer website and the Physician's Desk Reference, plaintiff further argues that prescribing Vistaril did not "meet the appropriate standard of care," and the dosage was inadequate. (Id.). In his deposition, plaintiff described his treatment as "a joke," and cited to a fellow inmate who concurred that treatment with Vistaril "is inferior to detoxification with methadone." (Id. at 3-4).

Contrary to plaintiff's assertions, the response of defendants here hardly constituted "deliberate indifference." If defendants had ignored plaintiff's request for assistance with detoxification, and left him to withdraw "cold turkey" alone in his cell, then plaintiff's arguments would have validity, such as the rather horrifying claims in Norris, Walker, Foelker, and Davis. Instead, consistent with the DOC's medical protocol, and that of other prison systems, plaintiff was immediately put on Vistaril at HCC, transferred the next day to the IMHU at Garner at the direction of a psychologist who examined him at HCC, seen by a psychiatrist who placed him on Risperdal for his bipolar disorder, given a prescription for Clonodine by an additional physician if plaintiff's blood pressure went up or if plaintiff had agitation which was not controlled by the Vistaril, and then sent back to HCC by the same psychiatrist. Thus, the facts here much more closely resemble those in Holly and Boyett, where the courts approved the substitution of medications in place of methadone. And as the Third Circuit cautioned in Walker, "[w]here a prisoner has received some medical attention

and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." Id. at 575, n.2 (citations omitted)(emphasis added). Moreover, unlike the plaintiffs in Cudnik and Anderson, plaintiff here did not present any medical experts on his behalf; opinions are offered only by plaintiff and a fellow inmate, who concurred that treatment with Vistaril "is inferior to detoxification with methadone." (Dkt. #55, at 3-4). As the Second Circuit advised in Hyde, 429 F.2d at 867-68, "[a] difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983." In addition, this case differs from Norris and Davis, where the prison officials failed to comply with statutory or regulatory guidelines in handling such matters.

Thus, summary judgment for defendants is appropriate on this claim.

## 2. EQUAL PROTECTION

As U.S. District Judge Mark R. Kravitz summarized three months ago, in order to prevail on a gender-based equal protection claim, a plaintiff

> must show that she suffered purposeful or intentional discrimination by [defendant] on the basis of her gender. . . . A plaintiff alleging a violation of her equal protection rights may present evidence of the treatment of others of a different gender as a basis for the trier of fact to infer that the differing treatment meted out to the plaintiff was based on gender. Where such evidence is present, a court seeks to determine whether the similarity between the circumstances of the plaintiff and those of the comparators tends to prove that gender was a factor in the differing treatment.

Dutko v. Lofthouse, 549 F. Supp. 2d 187, 191 (D. Conn. 2008)(multiple citations, internal quotations & alterations omitted). Morever,

> To prove an equal protection violation, [a plaintiff] must prove purposeful discrimination directed at an identifiable or suspect class. Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of,

26

its adverse effects upon an identifiable group.

Magnuson v. Mariorano, No. 3:06 CV 759 (JCH), 2007 WL 2889464, at *5 (D. Conn. Sept. 28, 2007)(citations, internal quotations and alterations omitted)(emphasis in original) (summary judgment granted for defendants where plaintiff failed to demonstrate that she was treated differently than similarly situated male applicants).  See also Phillips v. Girdich, No. 9:03-CV-1019, 2007 WL 3046744, at *6-7 (N.D.N.Y. Oct. 17, 2007)(summary judgment granted for defendants where plaintiff-inmate "fail[ed] to offer any evidence beyond his self-serving assertions" that white inmates received more lenient treatment than minority inmates); Bolton v. City of Bridgeport, 467 F. Supp. 2d 245, 252-56 (D. Conn. 2006)(summary judgment granted for defendants where white applicants for position of fire fighter presented "no evidence of discriminatory motivation or intent" in administration of entrance examinations;  cf. Collier v. Barnhart, 473 F.3d 444, 448 (2d Cir.)(applying similar test to Fifth Amendment equal protection claim), cert. denied, 128 S. Ct. 353 (2007).

Defendants argue that plaintiff, who is a male, is not similarly situated to female inmates in that he cannot become pregnant, and that legitimate reasons justify offering methadone only to female inmates.  (Dkt. #47, at 19-20).   Plaintiff argues that methadone is offered to all addicted female inmates, regardless of whether they are pregnant or not. (Dkt. #55, at 5).

As previously indicated, if a woman undergoes withdrawal while pregnant, the fetus will suffer withdrawal under conditions that cannot be closely monitored.  (Defendants' Statement ¶ 33; Blanchette Aff't ¶ 35).  Withdrawal during the first trimester of pregnancy poses significant dangers to fetal development and increases significantly the likelihood of fetal abnormalities.  (Id.).  Withdrawal during the third trimester of pregnancy creates a risk

that the fetus will abort or that a live birth will be substantially premature. (Id.). Women are generally given the option of being gradually detoxed during the second trimester or maintaining a low dose of methadone until they give birth. (Defendants' Statement ¶ 34; Blanchette Aff't ¶ 35). Women may not always agree to a pregnancy test upon admission to York. (Defendants' Statement ¶ 35; Blanchette Aff't ¶ 36). Since the pregnancy status of women is often unknown upon admission and since methadone is available at the facility under special license, opiate-addicted women may be offered a methadone detoxification program. (Id.). If it is subsequently learned that a woman is pregnant, the detoxification program can be changed to a low dose maintenance program until such time as withdrawal can safely occur without harm to the fetus. (Id.).

There are legitimate medical reasons for offering a methadone maintenance and/or detoxification program at the women's prison facility. (Defendants' Statement ¶ 36; Blanchette Aff't ¶ 37). In the case of the men's facilities, it is simply not medically necessary, and it would be unwise from both a medical and a security standpoint, to introduce a highly addictive controlled substance into the men's facilities where it may be subject to abuse and misuse with little or no medical benefit. (Id.). The medications that are given in the men's facilities to treat the symptoms of drug withdrawal are prescribed by the medical staff who are very familiar with the signs and symptoms of drug withdrawal. (Defendants' Statement ¶ 37; Blanchette Aff't ¶ 38).

Thus, plaintiff is not able to satisfy his burden with respect to this claim, and so summary judgment in favor of defendants is appropriate.

### 3. QUALIFIED IMMUNITY

Defendants further argue that defendants have qualified immunity. (Dkt. #47, at 20-

21).  In light of the conclusions reached in Sections II.B.1 & 2 <u>supra</u>, there is no need to address this issue.

II. CONCLUSION

For the reasons stated above, defendants' Motion for Summary Judgment (Dkt. #47) is **<u>granted</u>**.

<u>See</u> 28 U.S.C. § 636(b)**(written objections to ruling must be filed within ten days after service of same);** Fed. R. Civ. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules of United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Sec'y, H&HS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated this 5th day of August, 2008, at New Haven, Connecticut.

/s/Joan Glazer Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge